IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARGARET A. SWEET, | : | CIVIL ACTION NO. **1:CV-06-0502** |
| | : | |
| Plaintiff, | : | (Judge Conner) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| JOANNE B. BARNHART, | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant | : | |

**REPORT AND RECOMMENDATION**

This is a Social Security disability case pursuant to 42 U.S.C. § 405(g) and 42 U.S.C.

§ 1383(c)(3), wherein the Plaintiff, Margaret A. Sweet, is seeking review of the decision of the

Commissioner of Social Security (Commissioner) that denied her claim for disability insurance

benefits (DIB) and supplemental security income (SSI) pursuant to Titles II and XVI of the Social

Security Act (Act).  42 U.S.C. § § 401-433, 1381-1383f.

**I.  PROCEDURAL HISTORY.**

The Plaintiff protectively filed an application for DIB and SSI on October 8, 2003, alleging

disability since September 29, 2003, due to diabetes and depression.  (R. 41-44, 62).  In her brief,

Plaintiff alleges that she also suffered from disability due to lumbar spondylosis and scoliosis, a left

lumbar radiculopathy, moderate degenerative disc disease, bursitis, and foot ulcers.  (Doc. 8 at 1).

The state agency denied her claim.  (R. 31).  The Plaintiff filed a timely request for a hearing (R. 36),

and a hearing was held before an Administrative Law Judge (ALJ) on October 5, 2005.  (R. 303).

At the hearing, the Plaintiff, represented by counsel, testified, and a vocational expert (VE) testified.

(R. 303).  The Plaintiff was denied benefits pursuant to the ALJ's decision of October 21, 2005.  (R. 13).

On December 8, 2005, the Plaintiff requested review of the ALJ's decision by the Appeals Council.  (R. 8).  Said request was denied on January 9, 2006 (R. 4-6), thereby making the ALJ's decision the "final decision" of the Commissioner.  42 U.S.C. § 405(g) (1995).  The ALJ's decision is the subject of this appeal.

In compliance with the Procedural Order issued in this matter, the parties filed briefs in support of their respective positions.  (Docs.  8 and 9).

## II. STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999).  It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his
> physical or mental impairment or impairments are of such severity that he

2

> is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## III. ELIGIBILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits.  *See* 20 C.F.R. § 404.1520 (1990).  *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.  20 C.F.R. §§ 404.1520, 416.920 (1995).

The first step of the process requires the Plaintiff to establish that she has not engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b) (1995).  The second step involves an evaluation of whether the Plaintiff has a severe impairment.  See 20 C.F.R. §§ 404.1520(c),416.920(c).  The Commissioner must then determine whether the Plaintiff's impairment or combination of impairments meets or equals those listed in Appendix 1, Subpart P, Regulations No. 4.

If it is determined that the Plaintiff's impairment does not meet or equal a listed impairment, the Commissioner must continue with the sequential evaluation process and consider whether the Plaintiff establishes that she is unable to perform her past relevant work.  See 20 C.F.R. §§ 404.1520(e), 416.920(e).  The Plaintiff bears the burden of demonstrating an inability to return to

3

her past relevant work.  *Plummer*, 186 F.3d at 428.  Then the burden of proceeding shifts to the Commissioner to demonstrate that other jobs exist in significant numbers in the national economy that the Plaintiff is able to perform, consistent with his medically determinable impairments, functional limitations, age, education and work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f). This is step five, and at this step, the Commissioner is to consider the Plaintiff's stated vocational factors.  *Id.*

The ALJ proceeded through each step of the sequential evaluation process and concluded that the Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 13).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity since her alleged onset date.  (R. 14).  At steps two and three, the ALJ concluded from the medical evidence that Plaintiff's diabetes was severe within the meaning of the Regulations, but not severe enough to meet or equal the criteria for establishing disability under the listed impairments as set forth in Appendix 1, Subpart P, Regulations No. 4.  (R. 14).  The ALJ paid particular attention to Section 9.08 (Diabetes mellitus), *et. seq.*, of the Listings, but found that Plaintiff's impairments do not preclude her from performing all work-related activities.  20 C.F.R. Part 404, Subpart P, appendix I, Listing 9.08.  (R. 14-15).  Also at step two, the ALJ determined that Plaintiff's depression was not severe within the meaning of the Regulations.  (R. 15).

At step four, the ALJ found that the Plaintiff could perform her past relevant work as an inventory clerk.  However, the ALJ assumed that Plaintiff is unable to perform any of her past relevant work to continue with the sequential evaluation process.  (R. 17).  Accordingly, the ALJ moved on to step five and determined that Plaintiff retained the residual functional capacity (RFC)

to perform work at the light exertional level. (R. 17, 19). Based on the testimony of the impartial vocational expert, the ALJ determined that such work existed in the national economy in significant numbers. (R. 18). The ALJ also determined that Medical-Vocational Rule 202.07 directed a finding of not disabled. (R. 18-20).

The relevant time period for this case is September 29, 2003, the alleged onset date of disability, through October 21,2005, the date of the ALJ's decision.

## IV. BACKGROUND.

### A. Factual Background.

The Plaintiff was fifty-six years old at the alleged onset date of disability, making her an individual of "advanced" age under the Regulations. (R. 328). 20 C.F.R. §§ 404.1563, 416.963(e) (2004). She has a high school education and worked as a cashier/inventory clerk and secretary until September 2003. (R. 305-308). Plaintiff alleged a disability onset date of September 29, 2003. (R. 305). The vocational expert testified that Plaintiff's work as a cashier was classified as low-level semi-skilled work in the medium duty physical exertion level. (R. 329-330). The VE also testified that Plaintiff's work as a secretary was classified as semi-skilled work in the sedentary to light duty physical exertion level. (R. 330). The VE testified that Plaintiff had limited skills that could be transferred. (R. 330).

Plaintiff testified that she was late for work on numerous occasions and missed work occasionally due to problems with her diabetes. (R. 313). She stated that on September 29, 2003, she was late for work again and "just lost it and left." (R. 313-314). Plaintiff applied for unemployment benefits but was denied because she left work on her own accord. (R. 314). She

5

stated that there are days that she "can do wonders." (R. 316). For example, she can clean, dust the house and run the vacuum. (R. 316-317). There are other days when she cannot get herself out of bed. (R. 316-317). Plaintiff testified that on a scale of zero to ten (ten being the most pain), her pain level was about a six or eight at the ALJ hearing in October 2005. (R. 310).

### B. *Plaintiff's medical history.*

Plaintiff was diagnosed with type I diabetes mellitus over twenty-eight years ago. (R. 311). She takes two different kinds of insulin twice a day and other diabetes medications. (R. 106, 311). Plaintiff's diabetes caused her to experience cumulative side effects. (R. 311). Stress causes her sugar to rise, and anxiety causes her sugar to drop. *Id.* When her sugar is low, she gets very disoriented and weak. (R. 319). Plaintiff's sugar drops below fifty about three times a week. (R. 319). On three occasions, her sugar was above five hundred. (R. 319). Plaintiff testified that when her sugar is high she has blurred vision. (R. 320).

Plaintiff has constant pain in her lower back, pain in her left hip and leg, pain and numbness in her feet, and chronic ulcers in her right foot. (R. 317-318). Plaintiff takes Vicodin for pain; she testified that the Vicodin works and lasts about four hours. (R. 311). She has been taking Vicodin on and off for four years. (R. 311). Plaintiff testified that she was initially prescribed Norco for pain, but it did not work. (R. 320). She was also prescribed Percocet and Oxycontin for pain; she claimed that the Oxycontin did not work. (R. 320-321). Plaintiff received steroid injections to ease her pain. She occasionally lays in a tub to ease pain and has elevated her feet. (R. 324). She does not take hot showers because they make her weak. (R. 324). Plaintiff also takes Ambien for sleeping.

Plaintiff treated with her primary care physician, J. Bruce Ruppenthal, M.D., beginning in January 2002.  In January and February 2002, Dr. Ruppenthal treated Plaintiff for sinusitis, upper respiratory infections, diabetes, and problems with her right foot.  (R. 176-177).  Dr. Ruppenthal changed her insulin dose and recommended that she monitor her sugars and eat appropriately.  (R. 173, 176).  In April 2002, Dr. Ruppenthal continued to treat Plaintiff for her diabetes.  He noted that she "has extremely poor control due to her lifestyle problems.  She works an evening shift and has marked irregular hours, tends to smoke, and use alcohol to excess creating difficult problems for her control."  (R. 172).  Dr. Ruppenthal recommended that Plaintiff decrease smoking and decrease using alcohol.

In May 2002, Dr. Ruppenthal again recommended that Plaintiff cease smoking and decrease using alcohol.  (R. 171).  He also advised that she follow a diabetic diet and exercise regularly.  (R. 171).

In June 2002, Dr. Ruppenthal ordered x-rays of the thoracic spine, shoulders, lateral spine and chest PA and lateral, and cervical spine.  The thoracic spine x-rays showed moderate compression from a deformity at age eleven with demineralization and mild degenerative changes; the shoulder x-rays showed no evidence of fractures or dislocation; the lumbar spine x-ray showed demineralization with mild degenerative changes and mild levoscoliosis; the chest PA and lateral showed no active pulmonary disease; and the cervical spine x-ray showed reversal of normal lordosis due to muscle spasm or degenerative changes, but no evidence of book compression, fracture or subluxation.  (R. 157, 164-169).

7

A bone density test in July 2002 revealed that Plaintiff's bone density was below normal. (R. 155). Dr. Ruppenthal recommended a well-balanced diet, multi-vitamins, and weight-bearing exercise to help build and strengthen the skeleton. (R. 155).

Plaintiff continued treatment with Dr. Ruppenthal in 2004. (R. 113). In addition to diabetes treatment, Dr. Ruppenthal treated Plaintiff for high cholesterol, high blood pressure, colds, allergies, acid reflux, and depression. At times, Dr. Ruppenthal noted that Plaintiff's diabetes mellitus was "well controlled," and he recommended that she continue her current regimen. (R. 116, 123, 143, 148, 223, 235, 246, 267, 272, 276, 281, 286). At other times, Dr. Ruppenthal noted that Plaintiff was not following her regimen and her diabetes was not under control. (R. 121, 127, 135-138, 172, 238-241, 256, 262). He stated that "[h]er life schedule makes it difficult to control her diabetic control. More regular exercise is encouraged." (R. 121). Dr. Ruppenthal noted in January 2003 that Plaintiff "smokes regularly despite recommendations - up to 3 packs per day." (R. 146). On several occasions, Dr. Ruppenthal noted that Plaintiff was "not interested in discussing the possibility of tobacco cessation." (R. 117, 130). In November 2003, Plaintiff's diabetes was "poorly controlled due to non-compliance." (R. 129-130). Dr. Ruppenthal also noted that Plaintiff continues to drink, but "limits herself now to 2 drinks per day" and "has had episodes of heavy drinking." (R. 146).

In October 2003, Dr. Ruppenthal evaluated Plaintiff's depression and stated that if she curtailed her alcohol use, he would consider prescribing antidepressants. (R. 138). However, in November 2004, Dr. Ruppenthal stated that Plaintiff's depression was in the remission phase. (R. 256). Plaintiff testified that she tried several different medications for her depression. (R. 321).

Plaintiff underwent an x-ray of her foot in February 2004 after she dropped a tray on it.  (R. 119).  The x-ray showed "no evidence of fracture, dislocation, or bony destruction." (R. 119).  She also had complaints of a painful toe in 2005.  Plaintiff treated with a podiatrist for this "hammer toe;" she also had corns, bunions, and calluses.  (R. 227-230, 248-251).  An x-ray of her foot was performed in June 2005 which showed a pes planus[1] deformity and hallux valgus[2] deformity, with a bunion and degenerative change at the MP joint of the great toe.  (R. 295).

On July 26, 2002, Plaintiff was treated at Northeast Eye Institute, and there was no prescription change for her eyes.  (R. 109-112).  In March 2004, Dr. Ruppenthal noted that Plaintiff had a "good report" from Dr. Edward Nicks at Northeast Eye Institute and there was "no evidence of diabetic retinopathy." (R. 153).  Dr. Ruppenthal also noted that Plaintiff's vision was "grossly normal." (R. 152).

Dr. Ruppenthal ordered MRIs of Plaintiff's lumbar spine and left hip in January 2005.  (R. 288-291).  The MRI of the lumbar spine showed multi-level disc bulging with canal and neural foraminal narrowing, and mild to moderate degenerative change.  (R. 288).  The MRI of the left hip revealed mild degenerative change.  (R. 290).

Plaintiff treated with Joseph G. Cesare, M.D., from November 2004 to July 2005.  (R. 203-207).  She initially saw Dr. Cesare for evaluation of back, buttocks, hip, and left leg pain.  (R. 206). After a physical examination and x-rays, Dr. Cesare diagnosed her with acute trochanteric bursitis

---

[1] Pes planus is "a condition in which the longitudinal arch is broken down, the entire sole touching the ground."  Stedman's Medical Dictionary, 1356 (27th ed. 2000).

[2] Hallux valgus is "a deviation of the tip of the great toe, or main axis of the great toe, toward the outer or lateral side of the foot."  Stedman's Medical Dictionary, 784 (27th ed. 2000).

of the left hip, lumbar spondylosis/ scoliosis, and intermittent radiculopathy of the left leg. (R. 206). The physical examination revealed tenderness in the lower back, a negative straight leg raise test[3], normal strength and sensation, and decreased reflexes. (R. 206).

In January 2005, Dr. Cesare noted that the steroid injection helped with Plaintiff's bursitis and that she "definitely improved." (R. 204-205). He did not believe that Plaintiff was a candidate for surgery and contemplated an epidural injection. (R. 204). He recommended conservative treatment due to the improvement. (R. 204). In July 2005, Dr. Cesare again noted that Plaintiff is not a candidate for surgery. (R. 203). The physical examination in July 2005 revealed a positive straight leg raise on the left side and left leg lumbar radiculopathy. (R. 203). He recommended she continue with Tylenol and Vicodin for pain and a flexibility strength program. (R. 203). Plaintiff never had physical therapy as advised.

### C. State-agency physicians' reports.

Vinay N. Shah, M.D., a state agency physician, reviewed Plaintiff's medical records in April 2004 and completed a Residual Functional Capacity (RFC) Assessment. (R. 178). Dr. Shah found that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk and sit (with normal breaks) a total of six hours in an eight-hour workday; and push and/or pull unlimitedly. (R. 179). Dr. Shah found no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental

---

[3] The straight leg-raising test (SLR) is designed to detect nerve root pressure, tension, or irritation of the sciatic nerve. With the knee fully extended, the physician raises the involved leg from the examining table. A positive SLR test requires reproduction of pain at an elevation of less than 60 degrees. A positive SLR is the single most important sign of nerve root pressure produced by disc herniation. Andersson and McNeil, Lumbar Spine Syndromes, 78-79 (Springer-Verlag Wein, 1989).

limitations.  (R. 180-182).

Plaintiff further alleges that her disability stems from an affective disorder.  John D. Chiampi, Ph.D., a state agency psychologist, reviewed Plaintiff's medical records in April 2004.  Dr. Chaimpi completed a Psychiatric Review Technique Form and concluded that Plaintiff's impairments were not severe and there were coexisting non-mental impairments that required referral to another medical speciality.  Dr. Chiampi noted that Plaintiff "did not allege depression, but Dr. Ruppenthal consistently lists depression as his #2 diagnosis.  It does not appear that [Plaintiff] takes any meds in that regard, and she is not seeing a specialist."  (R. 200).

Dr. Chiampi evaluated Plaintiff's condition under the requirements of Listing 12.04 (Affective Disorders).  The Supreme Court has held that a claimant must prove that her condition meets every criteria in a listing before she can be considered disabled *per se*.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  A claimant is disabled *per se* under Listing 12.04 when she either satisfies the requirements of both 12.04(A) and 12.04(B), or of 12.04(c).  Dr. Chiampi's report found that "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria" of Listing 12.04(A).  (R.189).  Plaintiff presented no medical evidence to counter Dr. Chiampi's findings.

Listing 12.04(B) requires that the symptoms described in (A) result in at least two of the following:

> 1. Marked restriction of activities of daily living;
>
> 2. Marked difficulties in maintaining social functioning;
>
> 3. Marked difficulties in concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended

duration.


20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04.  Dr. Chiampi found there were mild restrictions

of activities of daily living; mild difficulty in maintaining social functioning; mild difficulty in

maintaining concentration, persistence, or pace; and no episodes of decompensation.  (R. 196).

The Plaintiff does not point to anything in the record contending that she meets the

requirements of Listing 12.04(C), which are:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that resulted in such marginal adjustment

that even a minimal increase in mental demands or change in the

environment would be predicted to cause the individual to

decompensate; or

3. Current history of 1 or more years' inability to function outside a highly

supportive living arrangement, with an indication of continued need for

such an arrangement.


20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04(C).  Dr. Chiampi specifically found that the

Plaintiff's mental impairments were not severe and did not meet Listing 12.04 (C).  (R. 197).  The

Plaintiff offered no expert medical opinion to counter Dr. Chiampi's findings.  We find that there

is substantial evidence to support the ALJ's conclusion that the Plaintiff has not met the

requirements for Listing 12.04 Affective Disorders.

We must stress that it is the claimant's burden to prove that her condition meets or equals the specific clinical requirements of a listed impairment, such as Listing 12.04, before she can be considered to be disabled *per se* without consideration of vocational factors, such as age, education, and work experience. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988) (citations omitted). To be entitled to disability benefits, a claimant must show that all, not just some, of the criteria for a listing are met. *Zebley*, 493 U.S. at 530. The Commissioner must make the legal determination as to whether an impairment meets or equals a listing. *See* 20 C.F.R. § 404.1527(e)(1) and (2).

Although the ALJ's decision did not go step-by-step through the requirements of Listing 12.04, substantial evidence supports the ALJ's finding that the Plaintiff was not suffering from depression at any time through the date of the ALJ's decision. (R. 20).

A vocational expert (VE), Patricia L. Chilleri, testified at the ALJ hearing. (R. 326-334). The VE initially classified Plaintiff's work as a cashier as light, according to the Dictionary of Occupational Titles (DOT). (R. 329). However, based on the fact that Plaintiff lifted up to thirty pounds in her previous work, her position was elevated to medium work. (R. 307, 329). The VE testified that Plaintiff's work as a cashier is classified as a semi-skilled position. The VE then classified Plaintiff's work as an inventory clerk as sedentary, but could range up to light duty. (R. 330). This job was also considered semi-skilled. (R. 330).

The ALJ specifically asked the VE to hypothetically consider an individual of the same age, education, and vocational background as the Plaintiff who could lift and carry twenty pounds

occasionally; ten pounds frequently; and stand, walk and sit for six hours in an eight-hour day.  (R. 330).  The ALJ found that such an individual could not perform Plaintiff's past work, but could perform other sedentary or light work of the unskilled to semi-skilled nature.  (R. 18).  The ALJ then asked the VE if there are other jobs in the regional or national economy that Plaintiff would be able to perform, and the VE responded, yes.  (R. 331).  The ALJ asked the VE to describe the sedentary and light, unskilled to semi-skilled positions.  The VE stated these positions are a receptionist with 1,000 positions in the Northeast Pennsylvania metropolitan area; an unskilled cashier with 2,100 positions; and a sorter, tagger, and folder with 1,100 positions cumulatively.  (R. 331).  The VE then determined that the Plaintiff would be able to perform any of these jobs in the sedentary to light unskilled to semi-skilled positions.  (R. 331).

The ALJ posed another hypothetical to the VE.  He asked the VE to consider the same individual, but this individual can stand, sit and walk for fifteen, twenty minutes; can lift no more than five pounds; and is unable to work a full eight-hour day without having to lie down, even with a sit/stand option.  (R. 331).  The VE testified that such an individual would not be able to find work in the national or regional economy.  (R. 331-332).

The VE testified that if Plaintiff was believed to be credible, Plaintiff would not be able to perform any of the jobs the VE described. (R. 334).

## III. DISCUSSION

### A. Whether the ALJ erred in finding the Plaintiff not disabled.

The Plaintiff argues that the ALJ erred in failing to find her totally disabled based on her impairments.  The Plaintiff argues that her disability stems from her uncontrolled diabetes.  (Doc.

14

8 at 7-8).  We found the medical records replete with notations of the Plaintiff's noncompliance with her diabetes regimen.

Plaintiff's treatment appears to improve as she is more compliant.  Dr. Ruppenthal noted on numerous occasions that Plaintiff's diabetes mellitus was "poorly controlled due to noncompliance." (R. 138).  Dr. Ruppenthal discussed with Plaintiff the necessity of complying with his regimen.  He noted that she was "non-compliant with medication therapy for diabetes." (R. 127).  Dr. Ruppenthal informed Plaintiff of the importance of complying with medications and Plaintiff replied that she would "consider" his advice.  (R. 129).  In September 2001, Dr. Ruppenthal noted "diabetic ketoacidosis secondary to noncompliance with medications." (R. 259).

Dr. Ruppenthal had several conversations with Plaintiff about the importance of quitting smoking and decreasing her alcohol use.  (R. 114, 117, 124, 130, 136, 138, 141, 143, 146, 148, 151, 153, 162, 171, 172).  He gave Plaintiff pamphlets about smoking and alcohol abuse and advised that her symptoms may be related to cigarette use.  (R. 130, 136).  He also recommended on several occasions that she comply with a diabetic diet and exercise regularly.  (R. 114, 121, 130, 136, 138, 141, 143, 146, 148, 151, 171).  Plaintiff failed to comply with these recommendations and was not interested in quitting smoking.  We therefore find that substantial evidence supports the ALJ's conclusion.  *See Barbera v. Director, Office of Workers' Comp. Programs,* 245 F.3d 282, 288 n.21 (3d. Cir. 2001) (noting that it is the ALJ's, not the reviewing court's, duty to draw reasonable inferences from the evidence).

The record established no exertional limitations on the Plaintiff's ability to engage in light work.  In September 2005, Dr. Ruppenthal stated that Plaintiff was moving furniture, moving

refrigerators and sofas.  (R. 259).  Her foot exam showed a pes planus deformity and hallux valgus

deformity with a bunion and degenerative change at the MP joint of the great toe.  (R. 295).  X-rays

in January 2005 of Plaintiff's pelvis and hips were "negative for any significant abnormality," and

an MRI of her left hip was negative for any avascular necrosis (AVN)[4] or fracture.  (R. 204).  Plaintiff

testified that she could lift or carry objects weighing five pounds.  (R. 316).  However, in April 2004,

Plaintiff indicated on a disability application form that she could lift twenty-five or thirty pounds.

(R. 84).  In that form she also indicated that she can climb all thirteen stairs up to her apartment and

she does so two to three times a day.  (R. 84).  Plaintiff testified at the ALJ hearing that she had

problems walking for more than fifteen to twenty minutes.  (R. 316).

We find substantial evidence supporting the ALJ's decision that Plaintiff was not disabled at

any time through the date of the ALJ opinion, October 21, 2005.  (R. 20).

**B.  Whether the ALJ erred in crediting the opinion of the DDS physician over the opinion of the treating physician.**

The Plaintiff argues that the ALJ erred in not giving controlling weight to the opinions of Dr.

Ruppenthal and Dr. Cesare, both treating physicians.  The Third Circuit set forth the standard for

evaluating the opinion of a treating physician in the case of *Morales v. Apfel*, 225 F.3d 310 (3d Cir.

2000).  The Court stated:

> A cardinal principle guiding disability eligibility determinations is that the
> ALJ accord treating physicians' reports great weight, especially "when their
> opinions reflect expert judgment based on a continuing observation of the
> patient's condition over a prolonged period of time." *Plummer v. Apfel*,

---

[4]  AVN is the death of bone tissue due to a lack of blood supply, most often affects the head of the
thighbone (femur), causing hip pain.  http://www.mayoclinic.com/health/avascular-necrosis/DS00650

> 186 F.3d 422, 429 (3d Cir.1999)]  (quoting *Rocco v. Heckler*, 826 F.2d
> 1348, 1350 (3d Cir.1987)); *see also  Adorno v. Shalala*, 40 F.3d 43, 47
> (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-
> 41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d
> Cir.1988); *Brewster*, 786 F.2d at 585.  Where, as here, the opinion of a
> treating physician conflicts with that of a non-treating, non-examining
> physician, the ALJ may choose whom to credit but "cannot reject
> evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at
> 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)).  The
> ALJ must consider the medical findings that support a treating physician's
> opinion that the claimant is disabled. *See  Adorno*, 40 F.3d at 48.  In
> choosing to reject the treating physician's assessment, an ALJ may not
> make "speculative inferences from medical reports" and may reject "a
> treating physician's opinion outright only on the basis of contradictory
> medical evidence" and not due to his or her own credibility judgments,
> speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v.
> Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id*. at 317-18.

The ALJ is required to evaluate every medical opinion received.  20 C.F.R. § 404.1527(d).

Although he must consider all medical opinions, the better an explanation a source provides for an

opinion, particularly through medical signs and laboratory findings, the more weight [the ALJ] will

give that opinion.  20 C.F.R. § 404.1527(d)(3).  While treating physicians' opinions may be given

more weight, there must be relevant evidence to support the opinion.  20 C.F.R. § 404.1527(d).

Automatic adoption of the opinion of the treating physician is not required. *See Jones v. Sullivan*,

954 F.2d 125, 129 (3d Cir. 1991).

Here, the Plaintiff argues that the ALJ erred by crediting the opinions of the DDS physicians

over the opinions of Dr. Ruppenthal and Dr. Cesare.  (Doc. 8).  Plaintiff argues that the opinions

of Drs. Ruppenthal and Cesare establish that she suffered from uncontrolled diabetes, lumbar

spondylosis and scoliosis, a left lumbar radiculopathy, moderate degenerative disc disease in the lumbar spine, left hip bursitis, foot ulcers and depression.  (Doc. 8 at 6-7).

In November 2005, x-rays revealed minimal left lumbar scoliosis, degenerative disc change, and no other abnormalities.  (R. 205).  In January 2005, Dr. Cesare ordered MRIs of Plaintiff's pelvis and hips.  He found no significant abnormality and no avascular necrosis (AVN) or fracture of the left hip.  (R. 204).  Dr. Cesare also noted in January 2005, that Plaintiff definitely improved, there was no evidence of trochanteric bursitis, pain free range of mobility of the left hip, a positive straight leg raise, and no clear cut radicular pain.  (R. 204).  Dr. Cesare did not believe Plaintiff was a candidate for surgery.  (R. 204-205).  The ALJ considered these findings when making his determination as to Plaintiff's disability.

The ALJ found, at step two of the sequential evaluation process, that Plaintiff has a severe impairment, diabetes.  20 C.F.R. § 404.1521.  (R. 14).  The ALJ also found that Plaintiff is not able to perform her past relevant work.  20 C.F.R. 404.1565.  (R. 17).  The ALJ further found, based on a careful review of all the medical evidence, that Plaintiff is capable of performing light work.  (R. 18-19).  Dr. Shah, the DDS physician, considered Plaintiff's diabetes, acid reflux, hypertension, left foot pain, and degenerative joint disease.  Despite these complaints, Dr. Shah opined that Plaintiff is still capable of performing a full range of light work.  Drs. Ruppenthal and Cesare did not even opine as to Plaintiff's work capabilities.  As the Defendant notes, when Plaintiff informed Dr. Ruppenthal that she intended to apply for disability, he made no comment whatsoever.  (Doc. 9 at 4).  Dr. Ruppenthal never stated that Plaintiff was incapable of working and never opined as to her abilities or inabilities.

"The only reasons for an ALJ to reject a treating physician's opinion are 'on the basis of contradictory medical evidence,' or if the opinion is unsupported by medical data." *Kurilla v. Barnhart,* 2005 WL 2704887, at *5 (E.D.P.A. Oct. 18, 2005) (quoting *Plummer,* 186 F.3d at 429 and citing *Newhouse v. Heckler,* 753 F.2d 283 (3d Cir.1985). Here, the ALJ's decision was supported by substantial evidence based on the testimony of the VE, the RFC assessment by Dr. Shah and the assessment by Dr. Chiampi. The ALJ and the VE found that Plaintiff cannot return to her previous work. However, there is substantial medical evidence that Plaintiff could perform other work, namely light work.

Finally, the ALJ noted that he "has considered the opinions of the Disability Determination Service (DDS)," which found the Plaintiff "has the residual functional capacity for work at the light exertional level" and that Plaintiff has "no severe mental impairment." (R. 17). The ALJ agreed with this opinion. *Id.* The DDS medical consultant was a non-treating, non-examining physician who reviewed the Plaintiff's medical records. The Third Circuit has held that when a conflict exists between the opinions of a treating physician and a non-treating/non-examining physician, the ALJ can credit either, but "cannot reject evidence for no reason or for the wrong reason." *Mason,* 994 F.2d at 1067. Moreover, "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." *Plummer,* 186 F.3d at 429. We find sufficient reason in the ALJ's decision for crediting the opinions of Drs. Shah and Chiampi.

The Plaintiff also argues that the ALJ erred by not stating whether he considered the reports of the DDS psychologist, Dr. Chiampi, and Dr. Cesare. (Doc. 8). On the contrary, the ALJ specifically noted that the DDS psychologist found that Plaintiff's depression caused her to have

"only mild restrictions of activities of daily living; mild difficulty maintaining social functioning; mild difficulty with concentration, persistence and pace; and no episodes of decompensation." (R. 15). Based on the findings of the DDS psychologist, the ALJ found that Plaintiff's depression does not significantly limit her ability to do basic work activities and is thus not severe. (R. 15).

The ALJ also specifically considered the findings of Dr. Cesare. The ALJ noted that Dr. Cesare diagnosed Plaintiff in November 2004 with left hip bursitis, lumbar spondylosis and scoliosis with left hip radiculopathy. (R. 16, 206). The ALJ also noted that Dr. Cesare recommended physical therapy in January 2005, but Plaintiff never complied. (R. 16, 203, 205). The ALJ considered the MRIs of Plaintiff's left hip and lumbar spine, all ordered by Dr. Cesare. (R. 16, 288-291). Based on these findings, we recommend a finding that the ALJ properly considered the opinions of Drs. Chiampi and Cesare.

### C. Whether the ALJ erred in dismissing the Plaintiff's subjective complaints.

The ALJ found that the Plaintiff was not completely credible and her testimony was not consistent with the medical evidence. (R. 16). The ALJ noted that Plaintiff's alleged onset date of disability was September 29, 2003, the day she left her job because she was late. (R. 16).

When considering a claimant's subjective complaints of pain, an ALJ must engage in a two-step analysis. First, an ALJ must determine if the alleged disabling pain could reasonably result from the medically determinable impairment; and second, the ALJ must consider the intensity and persistence of the claimant's disabling pain, and the extent to which it affects his ability to work. *See Diaz v. Commissioner of Social Security*, 39 Fed. Appx. 713, 714 (3rd Cir. June 12, 2002).

20

At the same time, "[a]n ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985).  Where in fact "medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." *Mason*, 994 F.2d at 1067-68 (citing *Carter*, 834 F.2d at 65; *Ferguson*, 765 F.2d at 37).

The distinction between exertional and non-exertional limitations is discussed in 20 C.F.R. §404.1569a.  Under that section, "[t]he classification of a limitation as exertional is related to the United States Department of Labor's classification of various jobs by various exertional levels (sedentary, light, medium, heavy, very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing and pulling." 20 C.F.R. §404.1569a(a).  When the restrictions affect the claimant's ability to meet job demands other than strength demands, the limitations are non-exertional.  Examples of such non-exertional limitations are difficulty functioning because of nervousness, anxiety, depression, difficulty seeing, hearing, maintaining concentration and remembering.  20 C.F.R. §404.1569a(c).  In this case, Plaintiff alleges exertional and non-exertional limitations.

The ALJ thoroughly examined all of the evidence presented to him.  He reviewed the medical records and the treating and examining physicians' notes.  He also considered Plaintiff's testimony regarding her pain and daily activities and capabilities.

Based on the evidence presented and the testimony at the hearing, the ALJ found the Plaintiff not entirely credible.  (R. 16).  "'[A]n ALJ's findings based on the credibility of the applicant

21

are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir.1997); *see also Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." *Frazier v. Apfel*, 2000 WL 288246 (E.D.Pa. March 7, 2000).

The ALJ pointed to both medical evidence and evidence of the Plaintiff's activities of daily living which contradicted the Plaintiff's claims of total disability.  The ALJ concluded that the medical record did not substantiate the extent of the Plaintiff's subjective complaints.  (R. 16).  The Plaintiff testified that she cleans, dusts, runs the vacuum, goes to the grocery store, and cooks occasionally.  (R. 316-317).  The ALJ noted that Plaintiff "is able to perform household chores, drive, grocery shop and tend to her personal needs, albeit at her own pace."  (R. 17).  Based on these capabilities, the ALJ found that the intense symptoms the Plaintiff described are not wholly credible.  (R. 16).  The ALJ found that the activities Plaintiff stated she is capable of performing "are inconsistent with the claimant's allegations of being totally disabled."  (R. 16-17).

Although an ALJ may not reject outright the opinion of a treating physician on his own credibility judgment, here, the ALJ did no such thing.  *Plummer*, 186 F. 3d at 429.  The record contains the opinion of Plaintiff's treating physician, Dr. Ruppenthal, and Dr. Cesare.  As discussed above, the ALJ found that the Plaintiff's diabetes was a severe impairment, but that it was not severe enough to meet or equal the criteria for establishing disability under the Regulations.

The ALJ did not "ignore" the allegations of disabling pain and exertional and non-exertional activities.  He acknowledged Plaintiff's testimony regarding the pain.  He then found the Plaintiff

not wholly credible for the reasons previously stated. Thus, the Plaintiff's work activities and medical records constitute substantial evidence supporting the ALJ's determination that the Plaintiff was not fully credible.

> **D. Whether the ALJ erred in misapplying the GRIDS to the Plaintiff's case and failing to award benefits even though the Plaintiff is of advanced age, cannot perform her past relevant work and possesses no transferable skills.**

The Plaintiff also argues that the ALJ misapplied the Medical-Vocational Rules. (Doc. 8 at 10). An ALJ may only use the grids without taking testimony from a VE, however, when no nonexertional limitations exist. *Sykes v. Apfel*, 228 F.3d 259, 270 (3d. Cir. 2000). Here, the Plaintiff contended that she has nonexertional impairments of depression and blurred, fluid vision. *See* 20 C.F.R. §§ 404.1569a, 416.969a (c)(1)(iv) (citing difficulty seeing as a nonexertional impairment). While the Plaintiff did not specifically allege blurred vision as a nonexertional limitation in her application, she testified that she experienced blurred vision. However, Plaintiff's medical records showed no marked problems with vision. The medical records show no diagnosis of diabetic retinopathy, (R. 14-15), the ALJ noted, paying special attention to the listing for diabetes, 20 C.F.R Part 404, Subpart P, appendix I, Listing 9.08. (R. 14-15). Listing 9.08(C) refers the factfinder to another regulation to evaluate whether a diabetic claimant's vision impairment meets or equals retinitis proliferans. The ALJ specifically noted that there was no retinopathy. (R. 14-15).

The ALJ's finding that the Plaintiff's diabetes did not meet or equal Listing 9.08's severity requirement did not preclude the ALJ from considering whether the Plaintiff may have had a nonexertional impairment at step five of the sequential evaluation. All that is required for a nonexertional impairment to be analyzed at step five is that the impairment be "at issue." *See*

*Butterfield*, 1990 WL 210605 at *4 (stressing that where "[w]hether or not [a claimant's] diabetes caused nonexertional impairments was 'at issue' at the hearing . . . the testimony of a vocational expert is required.") (citing *Green v. Schweiker,* 749 F.2d 1066, 1072 (3d Cir.1984).  Here, as noted above, the Plaintiff's nonexertional complaint of poor vision was at issue.  *Butterfield* found that the very fact that a claimant had diabetes mellitus raised a possibility of the nonexertional impairment of poor vision that an ALJ could not ignore.  *Id.* at *4 (E.D.P.A. 1990).  Here, the ALJ considered Plaintiff's allegation of blurred vision, but found no medical evidence to support her allegations. (R. 14-15).  We agree with the ALJ.

While it is true that Plaintiff is of "advanced age" and cannot perform her past relevant work, contrary to Plaintiff's argument, she does have transferable skills.  The VE specifically testified that Plaintiff has transferable semi-skills of handling money, taking calls, transferring calls, taking messages, scheduling appointments, stuffing envelopes, and collating papers.  (R. 330, 332-333).

The record states Plaintiff's duties as a cashier.  They were to operate the lottery machine, handle the cash, and balance the register and lottery revenues.  (R. 329).  The VE testified that according to the Dictionary of Occupational Titles (DOT), a cashier was classified as a low-level semi-skilled position.  (R. 329-330).  The VE also noted that Plaintiff worked as a secretary from 1989 to 1990.  This job required her to maintain inventory, issue late payments, check-in inventory, perform data entry, and maintain petty cash.  The DOT also classifies this position as semi-skilled. (R. 330).  As the Tenth Circuit noted, "[t]he cashiering jobs listed in the Dictionary of Occupational Titles range from unskilled to skilled.  Thus, it is clear that not all cashiering jobs are alike." *Dikeman v. Halter*, 245 F.3d 1182, 1187 (10th Cir. 2001).  We agree with the ALJ that Plaintiff's

position as a cashier may be classified as "semi-skilled."  Based on the foregoing, we recommend a finding that the ALJ properly applied the GRIDS and that Plaintiff is capable of performing light work.

**VI. RECOMMENDATION.**

Based on the foregoing, it is respectfully recommended that the Plaintiff's appeal be **DENIED.**

<u>s/ Thomas M. Blewitt</u>
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: January 10, 2007**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARGARET A. SWEET,             :     CIVIL ACTION NO. **1:CV-06-502**
                               :
   Plaintiff,                  :     (Judge Conner)
                               :
   v.                          :     (Magistrate Judge Blewitt)
                               :
JOANNE B. BARNHART,            :
Commissioner of               :
Social Security,              :
                               :
   Defendant                   :

## **NOTICE**

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated January 10, 2007.

    Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within ten (10) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the

magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.


                                        s/ Thomas M. Blewitt
      _____   **THOMAS M. BLEWITT**
                                        **United States Magistrate Judge**


**Dated: January 10, 2007**